The only issue and dispute here is whether police had reasonable suspicion to justify extending a traffic stop to run a drug investigation. They did not. For starters, Deputy Porter didn't include any of the facts that tend to dispel reasonable suspicion in his analysis. He had a drug dealer profile in mind when he extended the stop, and that was someone traveling from Atlanta, Georgia, to sell drugs at Harris Casino, but he ignored multiple facts that completely undercut that profile, including that Highway 441 is one of only two highways in Jackson County, and locals and tourists use that road every day to travel around the county. Podbielski isn't from Atlanta, and Porter had no information connecting him to Atlanta. Podbielski's driver's license was suspended, giving him a traffic-related reason to want to avoid being stopped and to be unusually nervous after Porter ordered him out of the car. His explanation of his travels was consistent with his passengers, Ms. Parton, and Podbielski was staying in a cab. So, both he and Ms. Parton's licenses suspended? Yes. Both of them? Well, in that case, they weren't going to be able to leave in that vehicle, were they? Does that change the analysis of whether the search could have occurred? I don't think it does, because the officer was citing him for no operator's license, and it's not clear that he wouldn't have been able to get back into the vehicle. The officer didn't testify to that at all, so the government didn't present any evidence that the vehicle would be impounded or any other evidence of inevitable discovery in this case, and it is their burden to present that evidence. I think it's also significant that Mr. Podbielski was staying in a cabin in the area and had been in town for several days, according to the trespass summons at Joint Appendix page 237, which was dated on July 22nd, and this stop was on July 25th. Considered in their totality, the circumstances simply don't add up to reasonable suspicion justifying a drug investigation. This is a nervous driver with a suspended license whose passenger had left her fly open after using the bathroom and was uncomfortable making eye contact with the officer, and the stop was in an isolated area in the middle of the night. The facts here just don't eliminate a substantial portion of travelers who are innocent. I know you're arguing about the reasonable suspicion and not the fact that the stop was prolonged, but how long was the entirety of the stop? Do you know? I think it was, well, before the drug dog, before the officer came back, I can't tell you the exact number of minutes, it was somewhere around 25 minutes, and if the court wants to talk about that, I mean, the officer, he extended the stop in a number of ways, beginning with searching for unrelated civil matters, child support. He completed, he changed the date on a summons, which he didn't have legal authority to do. He took a very long time to fill out the citation form, and then he spoke to, he took, he said that he took two minutes to speak to the K-9 officer about his drug investigation, and then, even then, when he had finished all of the documents and went to talk to Mr. Podbielski, he read the entire summonses aloud to him. He said that that was his belief about what he had to do under the law, but that's just not correct. And even then, when Mr. Podbielski asked him, am I free to go, he said no, because he didn't have the answer from the K-9 SNF yet. So under all those circumstances, the stop was certainly extended beyond the scope of a traffic stop, and the government doesn't really dispute that. And that was going to be my next question. Did the government ever argue that it was not unnecessarily prolonged? Not in this court. They made that argument in the district court, but they've abandoned it in this court. You pointed out, and correctly, I think that the, and maybe, I think you said this, if you didn't, I'll say it, that the law in this case is intended to ferret out, to make sure that the police are not able to dragnet innocent travelers while on the highway. So this occurred at about two-something in the morning, is that right? That's correct. So I wouldn't think there'd be a lot of traffic on the road at that point in time. Does that factor at all into the analysis? I really don't think it does. I mean, for one thing, there's a 24-hour casino in this county. Of course, Mr. Podbielski told the officer, and there's no reason to disbelieve that he wasn't going to or from the casino that night, but also, you know, people work at night. Not everybody has a nine-to-five job. There's a 24-hour casino. There are businesses to support it, gas stations and things like that. So there is some traffic, but also the officer didn't testify that it was unusual to see traffic on the road at night. And in particular, he didn't testify that this was a drug trafficking thoroughfare or that it was common to see people trafficking drugs along this highway. You also didn't mention that the officer found it strange that your client slowed down as the officer was passing him instead of sort of keeping pace with the speed limit on the highway. How would you characterize that behavior, if at all? Well, I mean, I personally don't think that it's strange, but he testified that it was strange. So let's take that at face value, but even then, he very quickly found out why Mr. Podbielski had a traffic-related reason to not want to be stopped, and that is that he was driving with a suspended license. So once he had that information, that factored just lost a lot of its juice, and furthermore, he didn't testify to any connection between that kind of behavior and specifically a suspicion of drug trafficking. And that slowing down and his knowledge that Mr. Podbielski was driving with a suspended license also dovetails with his testimony about Mr. Podbielski becoming more nervous after Porter ordered him out of the car and took his driver's license, because Podbielski's nervousness increased at the exact moment that he handed over the suspended driver's license to Porter, and he didn't tell him it was suspended. He was waiting for them to find that out. So the anticipation of getting in trouble for driving without a license would make anyone nervous, whether they were trafficking in drugs or not. And what's more, this court has repeatedly noted that it's normal to be nervous during traffic stops. Now, this officer- Is it normal to be sweating when it's 50 degrees out? Well, this officer did testify that he found him unusually nervous, but the particular circumstances of this stop would make anyone unusually nervous, because it is in an isolated area, and it's in the middle of the night, the officer testified that there were no houses or businesses in the area, and police had just escalated the encounter by having backup arrive, ordering Podbielski out of the car, taking his license, and then questioning him about its whereabouts. So in light of all these circumstances, this factor really deserves very little weight. I'd like to talk about, again, the fact that the vehicle was traveling at night on But Porter found no evidence connecting Podbielski to Atlanta, which he said was the source city for drugs. But even if he had, the cases that this court, where this court has relied on a source city as part of reasonable suspiciousness, had a lot more going on in those cases, such as inconsistent stories about travels, a lot of air fresheners, or a quick trip that's a drug courier. And again, as I said, this is one of only two highways in the whole county, and Porter himself testified that everyone uses this highway all the time. Can I get you to focus on the two pieces of evidence that I thought were fairly important in this analysis, and then Ms. Enright can probably point to some others, but, I mean, and that has to do with the passenger's behavior in the car. And you mentioned this briefly, the fact that she had her fly unzipped, and you posited all kinds of innocent and very interesting explanations for why someone would do something like that. But the officer testified that in his experience, one possible explanation was that she had hidden contraband either inside of her pants or inside of her. And then when you couple that with the fact that he noticed that she kept looking around, looking behind the car, which he testified was suspicious to him because he thought that she might be looking to see if something was hidden there, why wouldn't a reasonable officer in that case have a heightened suspicion of possible illicit activity on those facts? Well, I want to talk about those facts one at a time. So let me start with the fact that she was looking inside the vehicle, he says, as she was making sure something was hid, because I just want to be clear, she was inside the vehicle this whole time. She was not outside the vehicle looking in. So it's not comparable to what the government suggests, which is Terry, which is people walking by a business and looking from outside in. She's sitting in the vehicle, so she has to look somewhere in the vehicle. The problem with this testimony is that Porter didn't describe what movements Parton made that led him to suspect that she was hiding something, and that, it doesn't give this court the data that it needs to do its job of deciding whether it's... He testified that her pants were unzipped, and that was part of his reasoning. Right. That was part of his reasoning as well, but he also didn't testify about what her eye movements were to give this court the data that it needs to... So he basically, he said he had a suspicion. He's saying he has a suspicion. She's looking to see if she's hidden something, but this court said in Williams that officers have to apply their experience so that courts can make informed decisions on whether their suspicions are reasonable, and the court applied a similar rule in Drakeford where it refused to rely on the officer's testimony that a handshake was a hand-in-hand drug transaction because the officer didn't provide any details about the handshake that allowed the court to view it as suspicious. So this testimony that she looked like she was making sure something was hidden is just as conclusory as the officer's testimony in Drakeford about the handshake, and just like in Drakeford, it prevents the courts from assessing whether, for itself, whether her movements made his suspicion that she was looking to see if she hid something reasonable. He's doing the same thing that the officer in Drakeford did, which is labeling a person as a drug dealer and then viewing all of their actions through that lens. That's exactly what he did here, and it doesn't support reasonable suspicion. Talking about the pants. Can you address... Oh, go ahead. You're still answering. Let's talk about the pants. Yeah. Leaving pants. I offered all of those, all that information in the brief just to explain what we all know, which is that leaving your pants unzipped is not something that's unusual. Before I walked in here, I made sure that I had mine zipped up. Right? I mean, I paid so much more attention to the people wearing their pants unzipped on social media. That's fashion. But probably the most common reason for leaving your pants unzipped is the one reason that Parton gave him, which is that she had gone to the bathroom and she must have forgotten to zip them back up. Is she? Did she say that? Yes. The porter said he didn't believe her because no businesses were open at that hour to use the restroom. And that explanation for just believing her just doesn't make sense, because first of all, he knew she was a local resident, so she had a home in the area where she could have used the bathroom. He couldn't remember where they said they were traveling from, and he admitted that she could have used the restroom at somebody's house. That's certainly true, but isn't it equally possible that his explanation for what happened was also a fact? It's possible, but when you look at the totality of these circumstances, does this, under the totality of these circumstances, does that separate these travelers from... I guess my concern is you're kind of holding this officer to a pretty high burden under, you know, he's got to think, he doesn't have a lot of time. We've got the leisure of time here to be thinking, we've got 20 minutes each per side, but the officer doesn't have that amount of time. And he says, in my experience, someone who's fly is unzipped in the past is consistent with someone who's trying to hide contraband. I mean, why is that unreasonable? It's a hunch. It's just a hunch. Really? Yeah, I mean, it's just a hunch. What makes her different from someone who's... What was it about this stop that distinguished her from the innocent person who had done what she said she did, which is forget to leave her pants unzipped and then feel really Native American in the middle of the night in the stop in an isolated area when they start bringing things up? Did he know that? That she was a Native American? Yes, he knew she was Native. Okay. Can you address the fact that the officer's experience at the time of the suppression hearing that he testified about was much different than his experience at the time of the stop? Well, I think it's... Two year difference. I think it's really problematic because he had such a small amount of experience to begin with and half of it took place after the stop and because of the way that the prosecutor asked the questions, which specifically directed him to the number of stops that he had undertaken at the time of the hearing. So there's really just no way to parse out his testimony to know what experience he... What judgments he was making at the time of the stop versus what judgments he was making as a post hoc rationalization. And I think that that makes all of his testimony about his experience extremely problematic in this case because that kind of testimony applied to every single one of the factors that the government has cited here in support of reasonable suspicion. So in conclusion, I would just ask the court to vacate the district court's judgment and reverse the district court's ruling on Mr. Podbielski's suppression motion. Thank you, Ms. Hester. Mr. Enright. Thank you, Your Honor. May it please the court, I'll introduce myself again, Anthony Enright for the United States. The Fourth Amendment authorized Deputy Porter to extend the traffic stop Podbielski because he had reasonable suspicion that criminal activity was afoot. Can I just get something out of the way? If we don't agree with you on that point, do you concede that the stop was unreasonably prolonged? If there's no reasonable suspicion, then we lose Your Honor. Yes. Okay. I do agree with that. Deputy Porter testified specifically this was a case where, you know, the standard focus is on the facts known to the officer. And Deputy Porter testified that it was a combination of things that led him to suspect that the occupants were concealing something illegal, likely drugs, in the car. I think there are primarily five factors. Each of these are factors that the officer himself testified contributed to his suspicion. First, Podbielski… Before you get to that, I'm sorry to interrupt you, but… Absolutely. I want you to answer Judge Thacker's question is exactly what time period of the officer's experience is relevant here. I mean, there's some uncertainty as to whether or not some of that experience was pre-stop and some was post-stop. Does that matter? Or what… How are we supposed to parse that out? So, there… The Supreme Court in Ornello's made sure there's two parts to reasonable suspicion. One are the historical facts. Those are the things that need to be known by the officer at the time of the stop to justify reasonable suspicion. The second component is whether the inferences that give rise to suspicion are objectively reasonable. That component is viewed through the lens of an objectively reasonable officer. And that component is not limited in scope because it's an objective standard for this court. I think a court… An officer cannot say this is usual or unusual and inform a court's view of what's objectively reasonable to an officer based on information that he may not have known at the time. And I think the defense brief at least implicitly acknowledges that because it cites maybe 15 or 16 different articles about individuals, about people, about Native Americans, about casino, things of that nature that there's nothing to suggest were known to the officer at the time. And that's fairly common. I've seen many, many, many cases where this would come up. In almost every case, there's a difference of time between when an officer completed a stop and when he testified. And I have never seen a decision that holds that the officer's testimony needs to be But isn't there a world of difference between a rookie officer first time on the beat and a 20-year veteran and analyzing what the officer does or doesn't do? Yes, Your Honor. The Supreme Court has cautioned repeatedly that this court shouldn't treat them differently. A seasoned officer should not have more license to stop people than an inexperienced officer. And that's why what's relevant, what's subjectively relevant. What the officer must have known are the historical facts. And this court looks at those historical facts. The officer has to testify about and say, I was aware of that and I considered that. But then this court evaluates them through its own lens and decides whether an objectively reasonable officer would view those as suspicious. So, let me give an example about the one fact that I think is particularly favorable to you and that is his analysis as to what the woman was doing in the car with respect to the fly and hiding contraband. If he testified based on his experience that that was consistent with somebody trying to hide contraband inside either her pants or inside of her, if that experience had been garnered post-stop, does that matter? Possibly. It would be a little bit harder. I will mention, though, that he specifically testified multiple times. He had seen that during prior stops, during past stops. And he was asked about that. And there's, I suspect, I know my... But we don't know if those past stops were prior to the suppression hearing or prior to the actual stop at issue here, do we? I think his testimony was pretty clear. Had you, he was asked, had you seen examples of people concealing them in their underwear or in their body cavities during past stops? Had you at that time? And if there's any ambiguity, standard of review requires this court to resolve reasonable inferences in our favor because we prevail below. But I do think his testimony was pretty clear about that. So, yes, I do think that's... I do think... I think that's kind of on the ball because I think that's something this court can say, well, that's an objective fact, and I could see how that would be reasonable. Frankly, I think it's a bit... Obviously, I disagree with my friend here. I think it's a bit intuitive how that could be. The brief said we need to explain how pants work. But I think the way someone might be able to conceal drugs on that person may be... may not require any kind of special expertise to draw that inference. That said, I think this court should consider it under any standard because the evidence does support an inference that he had that... What were the factors you were going to talk about? I think you said there were... You were about to mention four or five. I'd say there's five, Your Honor. The first one is Pod BLC slowed down from the speed limit of 50 miles an hour to 35 miles an hour. The officer testified... I've never seen anyone slow down that much, and it's significant. We all see somebody slow... They're going a little over the speed limit. They slow down to the speed limit when the officers... When they pass an officer. He was going the speed limit, and he slowed down 15 miles an hour to evade the officer getting behind him. And the counsel... Didn't the police officer pass him and move in front of him? Yes. Right. Well, and what drew the attention of the officer first was that he touched the line on the right a couple of times and then touched the line on the left, right? Yes. And then reasonably, you might say, maybe that's an impaired driver, right? That's what the officer... Have you ever heard of somebody getting in front of an impaired driver? You think they're impaired. Let me get in front of them and slow down. Well, who would do that? That doesn't make sense. If anything, you're going to stay behind and say, I'm going to make sure I know where he or she is going before I get near them. The officer got in front of him and slowed down. Now, if a police officer is in front of me and slows down, I'm going to slow down. I think that's a natural citizen's reaction. Yes, Your Honor. I think he testified a little more than that. Initially, when he first approached him and saw him across the fog line once, he then caught up with him to take a better look at him and ended up passing him. At that point, he saw him across the fog line in his rearview mirror. He changed lanes to the other lane so he wasn't in front of him and then slowed down to get behind him, expecting that if he kept going at the same speed, he would get the pod guilty in front of him and he would move over. We can't take leave of our common sense and experiences. Most people do not want to pass police officers, particularly at 241 in the morning. If he or she goes down to 15, I'm doing 14. I mean, it's just natural because I've seen people slow down. Interstate highway traffic pulled police off. State troopers coming off. Everybody said, no, you pass him first. No, not me, you, you, you. I mean, it's just you can't. It's almost like manufacturing a reason to be suspicious. I mean, that's the universe to me. I don't. The reason I disagree with that, Your Honor, is because the officer testified. He had been, and here it is relevant because he, again, said never. I have never seen anybody slow down like that. In five years, okay, six months he spent as a bailiff, four and a half years at least he'd spent on the road as a trooper. He'd never seen that. And that's, I think, a fair example of the kind of thing this court should take into account when deciding whether something is objectively reasonable because those officers are. Okay, fair enough. As Ms. Hester said, we now know why he would. And the officer knew. He's a suspended driver. Doesn't that further inform what he had never seen before? Now we're talking about somebody slowing down because, whoa, I have a suspended license. I'm really going to make sure I don't pass it. The other way, it's a dynamic. It can't just be, okay, that's what stopped. Now, but I'm sticking with that. It'd have to be some legal reason why he did that. Now you have, although it's improper for him to have a suspended license, it's certainly not another offense that he's committing or has committed that would cause that, right? Well, the word certainty isn't the one applicable to reasonable suspicion. Well, I agree. I agree it's not assertive. I thought I said it informs what was initially may have thought to be an illegal reason. And it is illegal in the sense of that. He's going to give him a citation for that. That was the only reason for the stop. I just want to start there before we start talking about justify and extending that reason. Now, then you go to because his passenger's fly was unzipped. What's wrong with that? I mean, so you're in the car. You have a – I don't want to say – how is that illegal? If I may, Your Honor, let me break those parts into two parts. The first part is the stop. The officer testified that he stopped him because he thought he was inebriated. He decided he's going to initiate the stop after he saw him cross both lines and he was in front of him. Then he decided, I'll slow down to get behind him to initiate the blue lights. So that was the reason. The reason for the stop wasn't the slowdown. The slowdown was one of five factors that made him suspicious that he might be carrying drugs. And that slowdown was – Did the officer actually say that he thought that the defendant was trying to evade him by slowing down? I don't think he did, did he? He didn't testify that it was evasive, but he testified that it was – it made it more – as he slowed down, it made it difficult for him to get behind the car. Obviously, he didn't – he said he couldn't see the individual in the car at the time before the stop. He didn't know what was in their mind. But the inference you can draw from that is that's evasive conduct. The second one is when he gets out of the car and this court has – and the officer was very candid about this. Nervousness is not a good indicator of something unusual. Everyone – he testified. Everyone's nervous during a traffic stop. But this individual became increasingly nervous as the traffic stopped. That's right. He already knew he was going to get stopped for that license that Your Honor mentioned. And he wasn't – he was nervous, but not above the norm. And then he gets out of the car and he becomes extremely nervous. He's sweating in the high 50s. And the court – the officer identified these objective indicia of nervousness, of enhanced nervousness. It's increasingly nervous, indicating something more than just traffic infraction and just the suspended license. And then the passenger. The passenger's looking in the car as if – he's not – she could be looking outside of the car too, but she's looking inside of the car as if she's concealing something. And her pants are unzipped in a way that the officer's familiar with. People have concealed things in their underwear and in their person this way before. All of those factors combined, not any of them in isolation, give rise to more than an incoherent suspicion or option when viewed through the lens of an objectively reasonable officer. And there are these other contextual factors that exist. This court in Drakeford mentioned you have to look at – it's entirely appropriate for an officer to look at things like, well, what time of day is it? Are we right under some security cameras? Does the suspicion I'm drawing from these factors make sense in this context? That's what these factors like. What highway you're on, the fact that they have a relationship to the casino, the fact that they're from New Orleans. No, you go ahead. What does the casino have to do with it? It's simply something that corroborates his suspicion. The casino? It's a business. It's a licensed business. Absolutely, Your Honor. I'm really serious about this. Why? Because they're near the casino. What does that have to do with it? It has nothing to do with them being near the casino. It has to do with the fact they met at the casino. So? It's simply a corroborating factor that he has experience with the casino, knows a lot of drugs, came from Georgia. He didn't know the defendant was – the appellant was coming from Georgia. He testified he didn't know where, the appellant. Well, he couldn't remember. He said something, but he couldn't remember. So this is what I wanted to ask you. I just want to get straight that these are the five things that add up to reasonable suspicion as far as the government is concerned. The fact that he slowed down, that he was nervous, that the passenger was looking in the car where she was sitting, that her pants were unzipped because she says she had stopped to use the bathroom, and that they met at the casino. That's it? Those are the – Those factors aren't just the meeting at the casino. I have grouped those factors under the context of the stop. He was on a highway from Georgia. He was from Georgia. They had a connection at the casino. A highway that is from Georgia, but he didn't know that the appellant was from Georgia at the time he stopped him. He didn't know he was there. I mean, he didn't know when he – not at the initial stop, but by the time he called for the drug dog, absolutely. How far is that from the – I've been to that area you're talking about. How far is that from the Georgia line? I don't know, Your Honor. It's very close. I don't – I think you're right. Yeah, it's very close. But, you know, this is not Europe. You know, it's not a different country when you cross. It's still the United States. I mean, what difference does it make from Georgia? I'm sure a lot of Ohio people are near Huntington. There's a river right across from Ohio, right across from Kentucky. I mean, you know, Kentucky. I mean, what – how is that suspicious? It's not suspicious. Okay, well, you can see then a license plate in Georgia is not, correct? Not in isolation. And so you're saying a person who has pants unzipped who told the officer, I just used the bathroom, I forgot to zip my zipper. And I don't think there are many males particularly who could say that they've never forgotten to do that. I mean, so – and the other, he said they didn't pass him when he slowed down. They didn't pass him. And so that means you could extend the stop until you got a K-9 unit there to sniff around their car. With that, that's a whole lot of people you could stop and make them wait until you get a K-9 unit. I don't think so, Your Honor. I think the court got it right when it held that those factors exclude the vast majority or the majority of innocent travelers. Well, the court never held that because it never reached it. It didn't address – it specifically credited the officer's testimony to that effect when describing the facts. So this court can defer to that. And if it were a blank, then it would draw the inference in favor of the United States under the standard of review. But I think it was correct because it's very unusual for someone to slow down and speed limit 15 miles an hour. It's very unusual for someone to exhibit the escalating signs of nervousness that this particular defendant did. It was, to use the words of this court, nervousness beyond them. It is very unusual. It was consistent with and unusual. It was unusual and consistent with what he had seen drug traffickers do before. What was the speed limit? Fifty miles an hour. How much? Fifty miles an hour. Fifty. And the officer slowed down to 15, right? I believe he slowed down to 35 before he was able to get behind – or the obvious, he slowed down to 35 before the officer was able to get behind him. Slowed down to 35. Yes, Your Honor. And that was unusual. The officer testified he'd never seen – he'd seen people slow down in the police presence often, but never to that degree. What do you think the minimum speed limit was? I don't know if there was – there's no testimony about it. I really have no idea. So, in other words, this was legal conduct. Your Honor, every single thing the officer – they did that gave rise to reasonable suspicion was legal, like it is in most cases, like it was in ward law, like it was in terror. But the combination gave the officer reason to suspect that criminal activity may be afoot. And we're talking about what's reasonably necessary to detain someone very briefly, to investigate further, not anything close to probable cause, not anything close to a preponderance of the evidence, just objective facts that have been some more than an incoherent suspicion or hunch, sufficient to warrant reasonably detaining the individuals to investigate further. You would agree you can't rely upon inevitable discovery in this case under these facts. Do you agree with that? I agree with that, Your Honor. If this Court has any other questions, I'm happy to answer them. If not, I don't have much time left, but I will yield it back to the Court. Thank you, Mr. Enright. Thank you, Your Honor. Ms. Hester, you have some time reserved. I wanted to start with the question of the zipper and the officer's testimony about it, who was testifying to his experience at the time of the hearing or two years before at the time of the stop. And actually, the prosecutor asked him, past tense, had you encountered individuals during past stops, male or female, where they concealed drugs on their person, such as in their underwear? But the officer testifies, yes, sir, I sure have, present tense. That's on page 88. And the same thing happens on page 89. Had you ever previously encountered a female who had concealed drugs inside her vagina? The officer answers, yes, sir, I sure have, present tense. I also want to point out a comparison between the zipper factor and a factor that took place in the Bowman case. Where there, the officer thought it was suspicious that Mr. Bowman was told him that he was buying multiple cars off Craigslist. Because the officer says drug dealers often use multiple cars. And this court says, no, you can't do that. Because a far greater number of innocent travelers also use multiple vehicles and buy vehicles off Craigslist. Well, that same kind of reasoning applies here. Because the vast majority of people riding in cars with their pants unzipped have nothing to do with drug trafficking. I also want to talk about nervousness. Because I think the court should be wary of using even extreme unusual nervousness as a factor. Without taking into consideration the totality of the circumstances facing a person at the time. Because of the news, we all are more and more nervous about traffic stops, whoever we are. And the officer didn't testify that Mr. Pawielski was more nervous than drivers he stopped with a suspended license. He didn't particularize it to that kind of a stop. But also, I think that the court should seriously take into consideration this isolated area. And what the officers were doing at the time that caused the driver and the passenger's nervousness to get amped up. By having yet another officer drive up, so it's night, there's blue lights flashing. They order the driver out of the car, start questioning him. I mean, that kind of intensifying of a stop would make anyone nervous. It would make me nervous. And I think the court has to take that into consideration when it's considering what the officer says is unusual nervousness. What the officers were actually doing at the time that would make the people in the stop feel more and more uncomfortable about what was happening. That's all I have. If the court doesn't have more questions. Thank you. Thank you, Ms. Hester. Thank you, Mr. Inmate, for your arguments. I'm going to ask the clerk to adjourn the court. Sine die. And we'll come down to Greek Council. Sonnenberg Court stands adjourned. Sine die. God save the United States.
judges: Roger L. Gregory, Albert Diaz, Stephanie D. Thacker